## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  12-03** |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT FRANZ** | : | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS EVIDENCE

The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and Alicia M. Freind, Assistant United States Attorneys for the District, hereby files its response to the defendant's motion to suppress evidence, and apparent request for a Franks hearing.

Captioning the defendant's filing as a motion of any sort is a generous title.  A stream of conscious writing full of staccato blurbs and legal conclusions does not amount to a motion to suppress.  Try as it might, the Government had a hard time figuring out exactly how many and what issues the defendant raised in his motion.  The difficulty was only compounded by the defendant being blatantly incorrect in his relation of many key facts on which he bases his motion.  As a result, the government will lay out and respond to this issues that it believes have been raised.[1]

---

[1] It must be noted at the outset that the defendant never raised his motion to suppress the Bureau of Land Management ("BLM") warrant (Nardinger warrant) while litigating the "tusk case" in Alaska, which is the case directly related to the first search of the defendant's home. While the government is not aware of any law barring the defendant from raising this motion in the current litigation, the lack of a prior motion is strong evidence of its weakness.  Indeed, the defendant, a man with no prior criminal history, pled guilty to two felonies before this Court and was fined $100,000.  If the defendant truly believed that his current position had any merit, he would have litigated this motion before, rather than become a convicted felon, endure supervised

I.      **Factual Background**

In the summer 2009, the Alaska division of the Bureau of Land Management ("BLM") was conducting an investigation into a tour guide, Karen Jettmar, who was intentionally taking customers into protected BLM territory and protected state territory with her company Equinox Wilderness Expeditions.  Information provided on Jettmar's website led investigators to believe that Jettmar's customers were removing artifacts from state and federal property. Accordingly, BLM conducted an undercover investigation wherein the undercover agent, Jeanne Proctor, posed as a Jettmar customer and participated in a trip which encompassed protected lands. Robert Franz attended this trip as well.  During the trip, Franz bragged to Agent Proctor that he had taken trips with Jettmar since 2002, during some of which he took mammoth tusks from protected lands.  (Nardinger Affidavit ¶ 16).  Franz is also seen in a picture on Jettmar's website holding a Mammoth tusk (Id. at ¶¶ 2, 9).

Based on the Agent Proctors's investigation and the website, BLM sought a search warrant for Franz's home, including any computers within the home.  ("Nardinger Warrant").  The bases for the computer search included[2] that during the trip, Agent Proctor noted that Franz told her and trip members he would compile electronically and transfer to a CD his map and trip photographs to share among trip participants. Franz requested other trip participants send him copies of their photographs for incorporation into the trip CD and subsequently provided the following contact

_____

release, travel restrictions, and fines

[2] Other examples of evidence leading to probable cause included: the defendant's picture on Jettmar's website holding a tusk recovered from protected lands, the defendant's admissions during the trip about the tusk and other fossil recoveries, and his interactions with Jettmar, including his comment that she trespasses on protected lands.

information and email address to Agent Proctor:  169 Wildflower Drive, Plymouth Meeting, PA

19462 and Okpilak2006@verizon.net respectively.   Franz also indicated to Agent PROCTOR he

had produced similar documentaries on other trips.  Finally, Jettmar e-mailed the itineraries for

Agent Proctor's trip (including BLM and restricted lands) to customers, including the Agent Proctor.

Thus, there was good reason to believe that evidence of the crimes related to the removal of

paleontological resources from protected land would be found in the search of Franz's computers

and digital storage media.

Upon searching the house for evidence of the original crimes, BLM agents came upon

hard copy child pornography[3].  The agents took a brief break to call the United States Attorney's

Office to discuss what was found.  When the search resumed, the agents continued the search based

soley on the original, Nardinger Warrant.  If child pornography or erotica was found in plain view,

then it was seized, as contraband would not be left in the house.

---

[3] The defendant is correct that the agents first saw the framed pictures on the walls,
however, no effort was made to collect these images or stop the search until irrefutable child
pornography was found in a filing cabinet next to the defendant's bed.  See exhibit A, video
excerpt from the search.  This same filing cabinet contained tax returns, financial documents, and
other business records.  The search of the filing cabinet was well within the four corners of the
Nardinger warrant.  The agents stopped the search when they came across the following: (1)
"Child Love - Kinder Liebe 14" (magazine) copyright 1973 in Denmark.  The magazine
contained photographic images of prepubescence girls nude with close up of genitals (images are
of girls standing, sitting, legs apart and lifted, bent over etc).   Nude, prepubescent girls are also
photographs inserting objects into their vaginal.  There are also pictures of minor girls engaging
in sexual intercourse); and (2) "Child Love - Kinder Liebe 17" copyright 1973 in Denmark.  The
magazine contained photographic images of prepubescence girls nude with close up of genitals
(images are of girls standing, sitting, legs apart and lifted, bent over etc).   Nude, prepubescent
girls are also photographed inserting objects into their vagina.  Agents also found playing cards
called loli-tots, which contained both erotica and lascivious images of pre-pubescent girls.  See
Herrick Affidavit, ¶¶ 9, 16.

When preparing the computer for proper removal and imaging[4], the forensic agent reviewed a limited number of .jpg files (image files), per protocol, to determine if they were encrypted[5], the agent found what appeared to be an image of a partially nude, minor female.  File names also gave rise to belief that the computer contained child pornography.  Given the totality of the hard copy child pornography and the evidence found on the computer, the agents stopped searching the computer and contacted the FBI, because it its expertise in child exploitation cases.  Given that the imaging had to occur off site, and because contraband was believed to be on the computer, the hard drives and electronic media could not remain in the house.  Accordingly, the computer, hard drive, and electronic media were removed from the house.  Thereafter, the government sought a separate search warrant to maintain the hard copy pornography and search the electronic pornography.  ("Herrick Warrant").

## II.   LEGAL ANALYSIS

The defendant seems to attack both the Nardinger  and Herrick warrants in a manner that can be broken down as follows: (1) insufficient probable cause for the Nardinger Warrant; (2)

---

[4] Because of the volume of pictures and items stored on computer and hard drive, and instant imaging of the electronic devices was not possible. Indeed, the agents did not complete the search until after 2 a.m., even without imaging the computer.  At best, imaging the computer would have taken an additional 12 hours.  It was simply impracticable at the house.  Given the size of computer hard drives, external hard drives and other external media, the sheer volume of data to be imaged requires a great amount of time.  It is protocol to image the computer off site after a search.   This case was no different.  Moreover, contraband was believed to be on the computer, making the computer subject to criminal and civil forfeiture (18 U.S.C. §§ 2253, 2254).  It was a continuing crime for the defendant to possess such materials (18 U.S.C. § 2252(a)(4)).  The agents would have been derelict in their duties if they had not seized the computer.

[5]  The Nardinger Warrant expressly provided for the search of images, both hard copy and electronically stored.

improper execution of the Nardinger Warrant; and (3) insufficient probable cause for the Herrick

Warrant.   Somewhat sprinkled throughout, there is brief mention of issues pertaining to <u>Franks</u>,

although the motion is not captioned as a request for a <u>Franks</u> hearing.

Legal Standard

In <u>United States v. Whitner</u>, 219 F.3d 289, 295-96 (3d. Cir. 2000), the Third Circuit

succinctly stated the standard for reviewing an issuing authority's determination of probable cause

as follows:

> [A] reviewing court may not conduct a de novo review of the [issuing authority']s
> determination of probable cause.   [<u>United States v. ] Conley</u>, 4 F.3d [1200,]at 1205
> [(3d Cir. 1993)].   "[B]oth we and the district court exercise only a deferential review
> of the initial probable cause determination made by the magistrate." <u>Id.</u>   <u>See Illinois</u>
> <u>v. Gates</u>, 462 U.S. [213,] 236 [(1983)] ("A magistrate's 'determination of probable
> cause should be paid great deference by reviewing courts.' ") (quoting <u>Spinelli v.</u>
> <u>United States</u>, 393 U.S. 410, 419 [] (1969)).   A reviewing court must determine only
> that the magistrate judge had a "substantial basis" for concluding that probable cause
> existed to uphold the warrant. <u>Gates</u>, 462 U.S. at 238 [].

Indeed, even if a different magistrate judge may have found the affidavit

insufficient to support a warrant is of no moment.   As the Third Circuit held in <u>United States</u>

<u>v. Jones</u>, 994 F.2d. 1051, 1057 (3d Cir 1993):

> [W]e recognize that a different magistrate judge might have found the affidavit
> insufficient to support a warrant.   However, our role is not to make our own
> assessment as to whether probable cause existed.   Rather, we are constrained to
> determine only whether the affidavit provides a sufficient basis for the decision the
> magistrate judge actually made.

The affidavit "'must be read in its entirety and in a common sense and nontechnical

manner.'" <u>United States v. Jones</u>, 818 F. Supp. 2d 845, 848 (E.D. Pa 2011) (quoting <u>United States</u>

<u>v. Williams</u>, 124 F.3d 411, 420 (3d. Cir. 1997); <u>see also</u> <u>Conley</u>, 4 F.3d. at 1206 ("The supporting

-5-

affidavit must be read in its entirety and in a commonsense and nontechnical manner.") (citing Gates, 462 U.S. at 230-31 []). "[S]tatements in an affidavit may not be read in isolation -- the affidavit must be read as a whole." Conley, 4 F.3d at 1208 (quoting United States v. Brown, 3 F.3d 673, 678 n. 5 (3d Cir. 1993)); Illinois v. Gates, 462 U.S. at 234.

As the Supreme Court explained, the magistrate judge's task when authorizing search warrants is to "make a practical commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238 []. In Gates, the Supreme Court stated that "probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual context -- not readily, or even usefully, reduced to a neat set of legal rules." 462 U.S. at 232 []. (citing Gates, 462 U.S. at 230-31 []).

Each fact, viewed in isolation or even as a whole, need not be a "smoking gun" in the evidentiary world. Nor is the agent, as the defendant would suggest, required to show beyond a reasonable doubt that crimes were committed. All that is needed is probable cause linking the crime to the location to be searched. As the Third Circuit held, "[w]e repeatedly have noted [] that direct evidence linking the crime to the location to be searched is not required to support a search warrant." United States v. Whitner, 219 F.3d 289, 295-96 (3d. Cir. 2000).

Moreover, "the Fourth Amendment does not require probable cause to believe evidence will *conclusively* establish a fact before permitting a search, but only "probable cause ... to believe the evidence sought *will aid* in a particular apprehension or conviction."

Messerschmidt v. Millender, 132 S.Ct. 1235 (2012) (quoting Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 307 (1967).

Furthermore, the magistrate judge "may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996)(quoting United States v. Lawson, 999 F.2d 985, 987 (6th Cir.1993) (internal quotations omitted)).

Finally, in a motion to suppress, it is the defendant who bears the burden of establishing that his Fourth Amendment rights have been violated. United State v. Acosta, 965 F. 2d 1248, 1257, n. 9 (3d Cir. 1992).

A.   The Magistrate Judge Had A Substantial Basis to Find Probable Cause in The Nardinger Warrant.

Much of the defendant's outline/motion attacks the Nardinger Warrant with legal conclusions which (1) are wrong; and (2) have no factual support.  The government, therefore, does not address them specifically.  In general, the defendant offers his opinion about what the facts set forth in the Nardinger Warrant mean viewed through the narrow lens of what each paragraph of the affidavit may mean standing on its own.  His analysis is flawed for many reasons, however, including: (1) failure to even address or mention the deferential standard of review to the magistrate's finding of probable cause; (2) the insistence of trying to force the Court to review each fact of the affidavit in a vacuum versus the well settled law of viewing the totality of the circumstances leading to probable cause; and (3)  offering possible alternative readings or more

innocuous versions of facts in the affidavit, while ignoring the legal standard that the magistrate review the facts in a common sense fashion.

As mentioned, contrary to black letter law, the defendant attempts to offer innocent alternative readings for each paragraph in the affidavit viewed in isolation, rather than a commonsense reading of the facts as a whole.  By way of example, the defendant reads paragraph four as a being specific only to Jettmar's criminal behavior.  In reality, paragraph four outlines how the BLM investigation began, that is, investigation into Jettmar's business.  Paragraph four, and other portions of the affidavit, explain that while on Jettmar's website, Nardinger saw a picture of Franz holding what appeared to be a mammoth tusk fossil.  The quote on the website, regarding mammoth tusks, further supported Nardinger's belief that the object Franz was holding was, in fact, a tusk. Moreover, the embedded within the photograph was the title "river_kokolik_02.jpg."  This is relevant because the Kokolik river and surrounding areas are protected land.  Therefore, any collection of vertebrate fossils, such as a mammoth tusk, from this land is illegal.  The context of the text in combination with the photograph of Franz with the tusk, which indicates on its face that it was taken from protected lands is evidence which the magistrate would consider when deciding whether there was probable cause that Franz stole the tusk from protected lands and took it back to Pennsylvania.

Paragraph five clearly delineates that the investigation originated, and an undercover agent was utilized, to investigate various crimes as committed by Jettmar's outfitting business, Equinox Wilderness Expeditions.   Franz's name is not mentioned in this paragraph.  Nothing was overstated or misleading to the magistrate.

On the trip where the undercover was present, however, statements were made by Franz himself, as well as others, that gave rise to probable cause that the defendant conspired with Jettmar to obtain vertebrate fossils from protected lands.  For example, paragraph eight explains that Franz told the undercover agent that he had gone on four trips with Jettmar's company since 2002, which included trips to the Utukok River, Kokolik River and Okepeli Hot Springs.  As outlined in paragraph four, all of these rivers are on protected lands.  In paragraph 14, the affidavit describes that during the undercover's trip, when a participant finds footprints in the sand, Jettmar responds that "it's probably just some Arctic National native saying that we're trespassing."  Franz then adds "Oh, Karen Jettmar only illegally trespasses on rivers with a K in them."   Virtually all protected rivers have a "K" in them.  A common sense reading of Franz's comment is that he knows that the trips take place on protected lands without a permit, hence the sarcastic remark that Jettmar's trips trespass on all the protected lands.

Franz continues to discuss his fossil trophies while on the trip.  He volunteered that he kept the mammoth tusk, which was taken from public lands, at his home in Pennsylvania.  He even described the display case in the house.  See Nardinger Affidavit, ¶ 16.  He also talked about another tusk that he kept in his home.   Id.  He admitted that he took this tusk while on a Jettmar guided tour of the Utukok River, which is also protected.  Id.  He then stated that he was surprised to have not found "any ivory" on their current trip, which was also taking place on protected lands.  See id. at ¶ 7.  A common sense reading shows that Franz had a pattern of joining Jettmar for trips on protected lands, during which he searched for and collected vertebrate fossils, which he then shipped to his house in Pennsylvania.

Later in the trip, when Jettmar relates to the group that she wanted to visit Eskimo Hill, on protected lands, because she read that archeologists had found human remains on site, Franz commented only that they could not make it during the current trip because it was took far to hike and would take too much time.  Id. at ¶ 19.   A fair, common sense reading of this conversation, in light of all the aforementioned evidence, is that Franz would willingly explore those areas but for their time crunch.

This pattern is further bolstered by Franz's comment that he shared with the undercover that he had a "special artifact" at his house that Jettmar covets.  Id. at ¶ 10.  Given that Franz already discussed vertebrate fossils, a fair reading of his comments is that this item was even more rare, such as an archeological item.  The defendant offers an explanation for this comment, which not only is not a "common sense" reading of the facts, as required by law, but it is absurd. The defendant attempts to retrofit his admission to mean a loose reference to a movie quote that was missed by the "unread agent."  Under this rationale, Magistrate Judge Reuter must be "unread" in the apparently well known quips of Abbott and Costello as well.  In reality, this was no movie pun.[6]

But the issue is not what other interpretation of the facts the defense could conjure up to explain his remarks.  The comment is a clear statement that the defendant had other artifacts in his home.  Moreover, the law in no way would require a magistrate (or the agent for that matter) to read in this movie quote into the context of the affidavit.  It is so far afield from common sense, that if an agent used similar logic in a favorable way for the government, then he would be

---

[6] What makes the defendant's explanation even more ridiculous is its factual inaccuracy. See Dft. Mot., p. 5, ¶ iv.  The Defendant then says the duress of his boat capsizing that day is what makes quote analogous.  Id.  The defendant's boat, however, capsized a full day after making this comment.

reprimanded for overstating the facts.  The defendant's argument is ridiculous with <u>no factual or legal basis</u>.[7]

The defendant also raises issues regarding the inclusion of Franz's collection of petrified wood within the affidavit.  He alleges that somehow the magistrate was mislead in believing there was probable cause that the tusk stolen by the defendant would be located in his home or that the defendant conspired with Jettmar based on reference to petrified wood.  Once again, the defendant's arguments are without merit.   Here, the defendant's comments in front of Agent Proctor, read as a whole, consistently show that he went on trips to Alaska with Jettmar and sought to collect items, legally or illegally, and have those items shipped to his home in Plymouth Meeting, Pennsylvania.  His comments about the petrified wood, were not included to show the illegality of those acts[8].   Indeed, the search warrant did not seek to seize the petrified wood, nor did the agents seize the petrified wood during the search.  Rather, Franz's comment about the wood, when read in light of other comments about collecting items, is evidence that is it more likely than not that the tusk at issue would be found his Pennsylvania home thousands of miles from Alaska, which was the

---

[7] The government recognizes that probable cause is determined at the time the affidavit is presented to the magistrate.  However, it is important to note that the defendant's proffered movie quote explanation is further dismantled by the discovery of a sled runner at the defendant's house during the search.  Not only is the item made from a vertebrate fossil, but it is an archeological artifact and very rare.

[8] These facts may show illegality.  Although it is legal to collect "reasonable" amounts of petrified wood, it is only for noncommerical purposes.  43 C.F.R. 8365.1-5 (b).  Franz paid an outfitter for the trip, rendering any collection "commercial."  The collection of wood, however, was not offered for its potential illegality. Nothing ever mentioned any potential illegal nature of this collection.  It was offered to show the pattern of Franz taking trips, collecting items and shipping them home.

subject of the search warrant.  Finally, even if the reference to petrified wood was stripped from the affidavit, there is still abundant evidence of probable cause to search the defendant's home.

The defendant argues that there was no basis for the search of his electronic equipment, such as computers and hard drives. His main argument is that because the defendant's camera broke a few days into the trip, there would be no images for which to search.  The defendant is wrong.   The defendant's argument makes clear that is it the defendant, not the magistrate, who does not understand the object of the search warrant.  The Nardinger Warrant related to the theft of a mammoth tusk that occurred on a 2007 expedition with Jettmar.  It also related to a conspiratorial relationship with Jettmar and Franz that occurred from 2002, when they first met, until the present. The fact that the defendant's had no pictures from the 2009 trip in no way mitigates the evidence that the defendant admittedly meticulously documented his other trips with photographs and maps and compiled them onto CDs.

Indeed, as expressly outlined in the affidavit, the defendant told the trip participants that he was going to compile a CD which would incorporate photographs, annotated maps and some personal cartoon type attachments.  See Nardinger Warrant, ¶ 21.  He asked trip participants to send him their photographs.   Id.  He also said he would send each of the participant a CD.  Id.  He collected e-mail addresses and home addresses.  Id.  Importantly, the defendant also said that he produced similar documentaries from other trips.  Id.  Accordingly, not only would there likely be photographs on the defendant's computer documenting the trip that occurred on BLM lands in 2009, but there would likely be photographs of the 2007 trip when the tusk was stolen, and the other expeditions with Jettmar, which could further evidence the their conspiratorial relationship.   The only way to compile CDs of this nature is too download images and then burn them to a CD.

-12-

Accordingly, these facts alone create probable cause to search the computer and electronic storage. What's more, however, is that Jettmar communicated with trip participants via e-mail.  See id. ¶ 7. Jettmar sent her trip itineraries and invoices via e-mail.  Id.  These itineraries were evidence that the trips occurred on protected lands.  Id.  Accordingly, there was probable cause to search the computer and other electronic storage for similar itineraries and invoices for other trips.[9]

   In sum, the defendant ignores the highly deferential standard of review of Magistrate Rueter's issuance of the Nardginer Warrant.  Moreover, the defendant ignores the ample evidence outlined in the affidavit which supports the Magistrate's finding.  In doing so, the defendant misrepresents facts and offers unlikely alternative explanations of the facts in a vacuum.  Because the law requires a common sense reading of the facts read as a whole, the defendant has clearly failed to meet his burden of establishing that his rights were violated.  The motion to suppress, therefore, must be denied.

    B. The Execution of the Nardinger Warrant Was Appropriate

   The defendant alleges that the search was improper because the BLM agents did not image all of the electronic data before leaving the defendant's house.  Once again, the defendant is wrong.  The warrant clearly states that if "imaging proves impractical, or even impossible for technical reasons," then the agents may seize the computer and image it offsite.  See Nardinger

---

[9]  The defendant claims that there is "no proof [of] any illegal activity utilizing the computer."  See Dft. Mot. at p. 7.  First, there is not requirement that there be proof of illegal activity on the computer.  What is required is probable cause to believe that evidence of the crime(s) will be found on the computer.  As outlined above, the agents presented more than enough evidence to meet the burden of probable cause.  Magistrate Rueter found probable cause to permit access to the computers and electronic media.  Given the preference for warrants, there is a deferential review of Magistrate Rueter's finding.

Warrant, p. 18, ¶ 33.   The defendant's argument has been squarely addressed and rejected.  In <u>U.S.</u>

<u>v. Hill</u>, 459 F.3d 966 (9th Cir. 2006), the Ninth Circuit held:

> Returning to defendant's case, the court concludes that the police were not required to bring with them equipment capable of reading computer storage media and an officer competent to operate it. Doing so would have posed significant technical problems and made the search more intrusive. To ensure that they could access any electronic storage medium they might find at the scene, police would have needed far more than an ordinary laptop computer. Because computers in common use run a variety of operating systems—various versions or flavors of Windows, Mac OS and Linux, to name only the most common—police would have had to bring with them a computer (or computers) equipped to read not only all of the major media types, but also files encoded by all major operating systems. Because operating systems, media types, file systems and file types are continually evolving, police departments would frequently have to modify their computers to keep them up-to-date. This would not be an insuperable obstacle for larger police departments and federal law enforcement agencies, but it would pose a significant burden on smaller agencies.

> Even if the police were to bring with them a properly equipped computer, and someone competent to operate it, using it would pose two significant problems. First, there is a serious risk that the police might damage the storage medium or compromise the integrity of the evidence by attempting to access the data at the scene. As everyone who has accidentally erased a computer file knows, it is fairly easy to make mistakes when operating computer equipment, especially equipment one is not intimately familiar with. The risk that the officer trying to read the suspect's storage medium on the police laptop will make a wrong move and erase what is on the disk is not trivial. Even if the officer executes his task flawlessly, there might be a power failure or equipment malfunction that could affect the contents of the medium being searched. For that reason, experts will make a back-up copy of the medium before they start manipulating its contents. Various other technical problems might arise; without the necessary tools and expertise to deal with them, any effort to read computer files at the scene is fraught with difficulty and risk.

> Second, the process of searching the files at the scene can take a long time. To be certain that the medium in question does *not* contain any seizable material, the officers would have to examine every one of what may be thousands of files on a disk—a process that could take many hours and perhaps days. ... Taking that much time to conduct the search would not only impose a significant and unjustified burden on police resources, it would also make the search more intrusive. Police would have to be present on the suspect's premises while the search was in progress, and this would necessarily interfere with the suspect's access to his home or business. If the search took hours or days, the intrusion would continue for that entire period, compromising the Fourth Amendment value of making police searches as brief and non-intrusive as possible.

-14-

> Because of these considerations, the court concludes that the police were not required to examine defendant's electronic storage media at the scene to determine which contained child pornography and which did not. They were entitled to seize all such media and take them to the police station for examination by an expert.

Id. (cited with approval by the Third Circuit in U.S. v. Highbarger, 380 Fed. Apx 127, 2010 WL 1936262 (3d Cir. 2010).

The physical search of the house took until after 2 a.m.   It was extensive and resulted in a great deal of evidence that needed to be collected and accounted for.  Given the ability of electronic storage to hold vast amounts of data, and given that the defendant had a computer hard drive, an external hard drive and other devices, imaging at the house would have taken over 12 hours and clearly have been impracticable.[10]

The forensic examiner, Special Agent ("S/A") Randolph August, handled the electronic storage devices.   When he located hard drives and electronic storage, he proceeded, per protocol in his handling the search.  First, the defendant's computer was on.  Accordingly, Agent August had to take "screen shots" of those pages that were open.  Unless this process occurs prior to shutting down, that information would be lost.   The same process was utilized in order to preserve any Random Access Memory ("RAM") data that would be lost if the computer were shut down. S/A August also had to access the computer hard drive to ensure that files were not encrypted. Accordingly, he attached the computer hardware and software "write blockers."   These write blockers enable the acquisition of information from a computer or hard drive, without potentially

_____

[10] Not only was it impracticable, but it became apparent that the computer was likely to have contraband on it.  Indeed, a magistrate believed that there was probable cause that the computer had contraband on it.  Accordingly, the agents correctly seized the computer and hard drives in their entirety.

contaminating or affecting the defendant's computer or hard drive.  This is accomplished by allowing "read" commands, but preventing "write" commands.   In the search context, it ensures that the ultimate imaging of the computer is a pristine copy of how the defendant last left it, unaltered by the actions of an agent.

These write blockers also allowed S/A August to determine whether the hard drive was readable using BLM keyboards and monitors.  This step is taken so that the agents would not have to take the defendant's monitor, mouse, tower and keyboard.   S/A August did cursory reviews of documents and files, all of which were encompassed within the Nardinger Warrant, to ensure that these documents and images would open.  (Contrary to the defendant's assertion, the warrant expressly permitted a search for images and photographs.  See the definition of "records " and "information" in Attachment B to the Nardinger Warrant).   If these files would not open, then S/A August would have to seize the defendant's monitor, mouse, tower and keyboard as well.    Upon conducting the write blocker analysis, S/A August saw file names indicative of pornography.  Some of  the  file  names  could  have  been  indicative  of  child  pornography,  such  as vid070_skinny_teen_strip.flv.   Agent August also saw an image of what appeared to be a partially nude, minor female.   When viewed in light of the hard copy child pornography already found in the home, S/A August stopped all searches, shut down and contacted the FBI, whose expertise is in the field of child exploitation.

Far from the defendant's allegations, therefore, all of the actions taken by the BLM agents showed restraint.  Indeed, the defendant is complaining because the agents were conservative it their approach to the search warrant, and stopped to get a piggy back warrant in an abundance of caution before proceeding further.   What is clear from the defendant's motion, is that there is a lack

of understanding of what occurred during the forensic review.  The onsite review was conducted solely to ensure that the electronic media was able to be viewed and imaged off site, given the impracticality of an on site imaging.   The BLM agents were not, as suggested, rifling through documents and photographs hell-bent on finding child pornography.  The computer files were barely touched during the search of the home.  Indeed, at the time that the computer was imaged and actually fully searched, BLM agents were not involved as the Herrick warrant (FBI) had been signed.

  Accordingly, the defendant's argument that the agents somehow went on a fishing expedition through the defendant's computer is (another) gross misstatement of the facts.  The defendant's motion, therefore, is without merit and should be denied.

Finally, the defendant appears to attack the areas searched by agents as going beyond the scope of the warrant.  See Dft. Mot. p. 10.  Once again, the defendant is incorrect.  The scope of the warrant included any and all evidence about the 2007 trip wherein the tusk was stolen, and evidence of  a conspiratorial relationship with Jettmar over the course of eight years.  Agents were looking for, among other things, slides, invoices, maps, pictures and emails both in hard copy and electronic form.  The agents looked in all areas that could possible have held materials of this size. Agents are not bound by how the defendant labels things.  Indeed, criminals often hide evidence in seemingly innocuous places.  The defendant makes sarcastic remarks about the search of the fire proof box, yet, the box was large and capable of storing any number of items that fell within the warrant.  Moreover, knowing how passionate the defendant is about his trips and pictures[11], it is perfectly reasonable to have searched for items in that box.  In the experience of the agents, portable

---

[11] Mr. Franz maintained thousands of slides of pictures of trips in metal boxes, in an almost business like fashion.  Even after he scanned these slides into digital form, he maintained these slides.

electronic storage can be found almost anywhere in the house. Indeed, Agent August has found thumb drives in bookshelves on prior occasions. (And the defendant has kept electronic media in such obscure places as his neighbor's house). If the agents did not do a thorough search of the house, they would have been remiss at their jobs. Once again, the defendant does nothing more that blow smoke with no evidentiary basis. The defendant's motion, therefore, should be denied.

C.     The Magistrate Judge Had A Substantial Basis to Find Probable Cause in The Herrick Warrant.

The defendant's attacks against the Herrick warrant, include: (1) that the execution of the Nardinger Warrant was illegal; (2) that there was no evidence of "criminal activity" prior to the Magistrate approving the warrant; and (3) that the warrant was based on child erotica alone, with no evidence of child pornography.

The first argument has already been disposed of above. Magistrate Judge Rueter had more than probable cause to approve the Nardinger Warrant and the execution of that warrant was proper, and, indeed, conservative.

The second and third arguments are really one in the same, and they are both premised on another gross misrepresentation of the facts. The defendant claims that it was the pictures adorning the bedroom walls, and books of child erotica that caused the original search to be stopped and the piggy back warrant to be obtained. See Deft. Mot., pp. 11-12, ¶¶ F, I (i)(ii). Not only does the Herrick affidavit not support this argument, but the defendant has had a copy of the videotape of the search for well over a year, that shows, in no uncertain terms, that the original search did not stop upon viewing the erotica, but only after hard copy child pornography magazines were discovered. It is video. It is unequivocal. Yet the defendant premises almost his entire argument

on a factual predicate he knows to be false.[12]  See Exhibit A, video excerpt.

As outlined extensively in the government's 404(b) motion filed with the Court, and not to be belabored here, the presence of child erotica, though in and of itself legal, when combined with the discovery of child pornography, is evidence that child pornography will be found within the house and on the defendant's computer.  See Kenneth V. Lanning, Child Molesters: A Behavioral Analysis 65, 93 (5th ed. 2010) (stating that child sex offenders are "highly likely" to collect child erotica because it is "related to their sexual interests."); United States v. Vosburgh, 602 F. 3d 512, 537-38 (3d. Cir. 2010(upholding the admission of child erotica because "[p]ossession of those pictures suggested that [the defendant] harbored a sexual interest in children, and tended to disprove any argument that he unknowingly possessed" child pornography).  Therefore, the erotica found all over the defendant's house, during the search for evidence under the Nardinger Warrant is far from irrelevant.[13]  However, it was the hard copy child pornography that was discovered that led to the Herrick Warrant.

What's more, as noted above, upon conducting a portion of his forensic analysis, S/A August saw file names indicative of pornography.  Some of the file names could have been indicative of child pornography.  He also saw an image of what appeared to be a partially nude, minor female.  When viewed in light of the hard copy child pornography already found in the home, S/A August stopped all electronic searches, shut down and contacted the FBI, whose expertise is in the field of

_____

[12] Before the defendant casually lobs accusations of lack of candor to the court in his motion (page 13), he should review the evidence in the case.  It would prevent unfounded accusations and prevent him from misleading this Court about the facts and evidence.

[13] The Herrick affidavit never suggests that the art work or books are child pornography.  Rather, the affidavit describes the images.  The affidavit only describes the magazines, lollitots cards, and Show Me! book as containing lascivious images.

child exploitation.   The evidence seen during the preliminary forensic review (identified in paragraph 17 of the Herrick Warrant) was  viewed by the Magistrate in conjunction with the hard copy child pornography recovered, including:

- Magazine/Book - "Child Love - Kinder Liebe 14" copyright 1973 in Denmark.  The magazine contained photographic images of nude, prepubescent girls, with close up of genitals (images are of girls standing, sitting, legs apart and lifted, bent over etc).   Nude, prepubescent girls are also photographs inserting objects into their vaginal.  There are also pictures of minor girls engaging in sexual intercourse).
- Magazine/Book - "Child Love - Kinder Liebe 17" copyright 1973 in Denmark.  The magazine contained photographic images of nude prepubescent girls, with close up of genitals (images are of girls standing, sitting, legs apart and lifted, bent over etc).    Nude, prepubescent girls are also photographed inserting objects into their vaginal.
- Playing cards - "Lollitots," many of which contain images of minor girls, many of whom are prepubescent, in sexually explicit poses, with a focus on the genitals.
- "Show Me!", which contained images of child pornography (i.e., children masturbating one another).

See Herrick Affidavit ¶ 16.

When viewed in the common sense, totality of the circumstances manner which the law requires, and not in the factually made up, fantasy world of the defendant, there is more than probable cause for the issuance of the Herrick Warrant.

> D.   Child Pornography Would have Been Inevitably Discovered During the Execution of the Nardinger Warrant.

The agents were not required to stop the first search upon finding evidence of child pornography.  The agents should be applauded for their conservative approach and their preference for obtaining a warrant, issued by a Magistrate Judge, prior to proceeding with a more in depth forensic analysis of the electronic media.

Even if the agents did not err on the side of caution to obtain the second, Herrick Warrant from the outset, however, the evidence of child pornography would still be admissible because it would have ultimately been discovered during the execution of the Nardinger Warrant. Nix v. Williams, 467 U.S. 431 (1984) (evidence obtained as a result of questioning in violation of right to counsel would have been inevitably discovered by lawful means); United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994) ("Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way"); United States v. Whitehorn, 813 F.2d 646, 650 (4th Cir. 1987) (evidence from unlawful "sweep" admissible under inevitable discovery doctrine). The evidence in this case "inevitably would have been discovered by lawful means." Nix, 467 U.S. at 444; See United States v. Stabile, 633 F.3d 219 (3d Cir. 2011) (in a financial crimes case, the search warrant mistakenly authorized the wrong hard drive to search, which contained child pornography. The Third Circuit held that the child pornography would have been inevitably discovered because a search of the appropriate hard drive would have revealed child pornography, which would have provided the probable cause to access additional hard drives).

The defendant's arguments on pages eight, nine and 15 of his brief show that he has no idea how a forensic review is conducted. Agents do not thumb through files in the same manner that a typical user looks through images and documents. Rather, after a computer is imaged, an examiner runs programs to look for specific types of files, such as .jpg or image files. The examiner must then look through every image to determine whether any are relevant. There is no way to, for

example, to carve out only images of "tusks" or "Alaska."[14]  There is, therefore, no doubt that BLM agents would have seen images of child pornography while executing the Nardinger Warrant without stopping to obtain the Herrick Warrant.

      E.     <u>The Agent's Reasonably Relied on the Warrant's Authority, therefore, The Good Faith Exception Applies</u>

---

[14]   This type of argument has been rejected as well.  In U.S. v. Hill 322 F. Supp. 2d 1081, 1090 -1091 (C.D.Cal.,2004), the Court noted:

> Defendant also argues that the warrant was overbroad because it did not define a "search methodology." He claims that the search should have been limited to certain files that are more likely to be associated with child pornography, such as those with a ".jpg" suffix (which usually identifies files containing images) or those containing the word "sex" or other key words.

> Defendant's proposed search methodology is unreasonable. "Computer records are extremely susceptible to tampering, hiding, or destruction, whether deliberate or inadvertent." *United States v. Hunter,* 13 F.Supp.2d 574, 583 (D.Vt.1998). Images can be hidden in all manner of files, even word processing documents and spreadsheets. Criminals will do all they can to conceal contraband, including the simple expedient of changing the names and extensions of files to disguise their content from the casual observer.

> Forcing police to limit their searches to files that the suspect has labeled in a particular way would be much like saying police may not seize a plastic bag containing a powdery white substance if it is labeled "flour" or "talcum powder." There is no way to know what is in a file without examining its contents, just as there is no sure way of separating talcum from cocaine except by testing it. The ease with which child pornography images can be disguised—whether by renaming sexyteenyboppersxxx.jpg as sundayschoollesson.doc, or something more sophisticated—forecloses defendant's proposed search methodology.

See also, Stabile, 633 F.3d at 237 (citing United States v. Burgess, 576 F.3d 1078, 1092-94 (10th Cir. 2009) ("[T]here may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders, and that is true whether the search is of computer files or physical files.").

-22-

Had the search warrant affidavit failed adequately to establish probable cause for the search, the evidence obtained through the searches would be admissible under the good faith exception to the exclusionary rule.  See United States v. Leon, 468 U.S. 897 (1984).  The Third Circuit has explained this exception as follows:

The good faith exception instructs that suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." [United States v.] Williams, 3 F.3d [69,] 74 [(3d Cir. 1993)].  "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate[ judge's] authorization.' " [United States v.] Loy, 191 F.3d [360,] 367 [(3d Cir. 1999)(quoting Leon, 468 U.S. at 922 n. 23 []).  The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception.  Leon, 468 U.S. at 922 []; Williams, 3 F.3d at 74.  Yet there are situations in which an officer's reliance on a warrant would not be reasonable and would not trigger the exception.  Leon, 468 U.S. at 922-23 []. Our Court has identified four such situations:

(1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;

(3) [when] the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Williams, 3 F.3d at 74 n. 4 (citations omitted).

United States v. Hodge, 246 F.3d 301, 307-08 (3d Cir. 2001) (footnote omitted).  Under these criteria, there is no basis to exclude the evidence seized pursuant to the search warrant here.

First, as the response has demonstrated the defendant cannot show any reckless, much less deliberate, falsehood in the probable cause affidavit.   Second, the defendant does not allege and there is no reason to believe, much less basis to conclude, that the issuing authority did

not act in the independent role assigned to such officers in our system of justice.  Third, as shown above, the probable cause affidavit amply supported the issuing authority's finding of probable cause.  Indeed, "[a]t a minimum, the affidavit was not clearly lacking in indicia of probable cause, but presented a close call."  Hodge, 246 F.3d at 309.  Finally, the defendant does not, as he cannot, allege that the warrant failed to specify the place to be searched or the subject matter of the search. Thus, the fruits of the search may not be excluded from evidence.

> F.    There Is No Basis For A *Franks* Hearing

In Franks v. Delaware,  438 U.S. 154, 171-172, 98 S.Ct. 2674, 2684 - 2685 (1978), The Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  Franks, 438 U.S. at 155-56

The thresh hold requirements for a Franks hearing to be ordered by this Court are incredibly difficult to meet.  Here, the defendant does not come close.  As the Supreme Court has outlined, for a Franks hearing:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one

> side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

Franks, 438 U.S. at 171-172.  The defendant argues that the inclusion of a reference to petrified wood collection in the Nardinger Warrant is an intentional misrepresentation that affected the probable cause determination in the Nardinger Warrant.  To reiterate the government's position as outlined above, the defendant alleges that somehow the magistrate was mislead in believing there was probable cause that the tusk stolen by the defendant would be located in his home or that the defendant conspired with Jettmar based on reference to petrified wood.  The defendant's arguments are without merit.   Here, the defendant's comments in front of Agent Proctor, read as a whole, consistently show that he went on trips to Alaska with Jettmar and sought to collect items, legally or illegally, and have those items shipped to his home in Plymouth Meeting, Pennsylvania.  His comments about the petrified wood were not included to show the illegality of those acts.   Indeed, the search warrant did not seek to seize the petrified wood, nor did the agents seize the petrified wood during the search.  Rather, Franz's comment about the wood, when read in light of other comments about collecting items, is evidence that is it more likely than not that the tusk at issue would be found his Pennsylvania home thousands of miles from Alaska, which was the subject of the search warrant.  Finally, even if the reference to petrified wood was stripped from the affidavit, there is still abundant evidence of probable cause to search the defendant's home.

   The defendant also alleges that the inclusion of child erotica in the Herrick Warrant was an intentional misrepresentation that should not have been included in the affidavit. This in incorrect.  As noted, child erotica, while legal, is often found in a child pornography

collection.  Regarding of whether the erotica is art or publications, the relevancy is the sexual

gratification that it provides the collector, similar to the gratification from child pornography.

See Kenneth V. Lanning, Child Molesters: A Behavioral Analysis 65, 93 (5th ed. 2010) (stating

that child sex offenders are "highly likely" to collect child erotica because it is "related to their

sexual interests."); United States v. Vosburgh, 602 F. 3d 512, 537-38 (3d. Cir. 2010(upholding

the admission of child erotica because "[p]ossession of those pictures suggested that [the

defendant] harbored a sexual interest in children, and tended to disprove any argument that he

unknowingly possessed" child pornography).   At no point in the Herrick Warrant, does Special

Agent Herrick categorize erotica as lascivious.  He carefully describes all of the erotica found in

the house, in an objective manner.  See Herrick Affidavit, ¶ 7.   Special Agent Herrick does not

mislead the Court or misrepresent anything.

       Even assuming for argument that the highly relevant erotica evidence was stricken

from the affidavit, the Magistrate still had direct evidence of multiple hard copies of child

pornography and files and images that suggested possession of electronic images of child

pornography.  The defendant, therefore, has absolutely no grounds on which to request a Franks

hearing.

WHEREFORE, the government respectfully requests that the Court deny the defendant's motion to suppress physical evidence.

Respectfully submitted,
ZANE DAVID MEMEGER
United States Attorney


ALICIA M. FREIND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that a copy of the Government's Response to defendant's Motion to

Suppress was served by electronic filing and/or first class mail, on the following defense counsel:

Richard Q. Hark
Hark & Hark
1818 Market Street, 30th Floor
Philadelphia, Pa 19103
Facsimile 215-575-6740


Alicia M. Freind
Assistant United States Attorney


Date: June  5 , 2012