**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION |
| v. : | |
| : | No. 12-03 |
| ROBERT FRANZ : | |

**MEMORANDUM**

**Schiller, J.**                                                                                                                              **October 18, 2012**

In a two-count indictment, the Government charged Robert Franz with receipt and possession of child pornography. Federal law enforcement agents recovered evidence of these crimes at Franz's home while executing a search warrant in an unrelated investigation, and then obtained a second warrant to search the computer and electronic storage devices they had seized during the first search. Franz now moves to suppress the evidence obtained pursuant to both warrants. The Court held a suppression hearing on June 21, 2012. For the following reasons, the Court denies the motion.

**I.     BACKGROUND**

In 2009, the Alaska division of the Bureau of Land Management ("BLM") was investigating allegations that Karen Jettmar, the owner of Equinox Wilderness Expeditions, was illegally bringing customers into protected territory, and that her customers were illegally removing artifacts from protected lands. In June 2009, undercover agent Jeanne Proctor posed as a customer and participated in one of Jettmar's trips. Franz also participated in the trip. During the trip, Franz boasted about having taken mammoth tusks from protected lands on previous trips. On Jettmar's website, a picture of Franz with the file name "river_kokolik_02.jpg" showed him holding one of the tusks. The Kokolik River is protected territory.

BLM subsequently obtained a search warrant for Franz's home in Pennsylvania, including any computers in the house, for evidence of crimes related to the removal of paleontological resources from protected territory (the "Nardinger Warrant"). The face sheet of the Nardinger Warrant described Franz's house as the location to be searched. However, in the space on the warrant face sheet where one describes the person or property to be seized, the Nardinger Warrant stated "see attached sheet." The "sheet" referred to was Attachment B, which contained a list of items to be searched for and seized. In addition to issuing the warrant, Magistrate Judge Thomas J. Rueter also approved an order sealing the warrant, affidavit, and accompanying docket papers. BLM agents executed the Nardinger Warrant on August 3, 2009. Upon entering Franz's home, the agents observed framed photographs of nude minor females on the walls. While searching a filing cabinet next to Franz's bed, the agents came across magazines containing photographs of nude minors engaged in sexually explicit conduct. At that point, the agents stopped the search to call the U.S. Attorney's Office in the Eastern District of Pennsylvania for guidance. The U.S. Attorney's Office advised the agents to seize any contraband found in plain view. In addition to the magazines, agents also seized playing cards and a book containing pornographic depictions of minors.

While preparing Franz's computer for removal and imaging, a BLM agent trained in the forensic analysis of digital evidence reviewed a limited number of JPEG files to determine if they were encrypted. One of the files he reviewed depicted a partially nude minor female. The agent also saw file names indicative of child pornography, such as "vid070_skinny_teen_strip.flv." Believing the computer contained contraband, the agents again stopped their search and called the Federal Bureau of Investigation ("FBI") for further guidance. Due to the volume of files stored on Franz's computer and electronic storage devices, the agents did not image the computer and devices during

2

the search of Franz's home. Instead, the agents seized these items for imaging off-site.

On August 12, 2009, the FBI obtained a second search warrant to search the computer and electronic storage devices that had been seized from Franz's home (the "Herrick Warrant"). In August 2010, Franz was charged with theft of government property and conspiracy to defraud the United States. He did not challenge the Nardinger Warrant in connection with those charges and pled guilty to both offenses. On January 5, 2012, Franz was charged in this case with receipt and possession of child pornography under 18 U.S.C. § 2252.

## II.     STANDARD OF REVIEW FOR MOTION TO SUPPRESS

On a motion to suppress, the movant bears the burden of establishing a violation of his constitutional rights by a preponderance of the evidence. *See Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978); *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992).

## III.    DISCUSSION

Although Franz's motion is not entirely clear, he appears to argue that: (1) the Nardinger and Herrick Warrants were issued without probable cause; (2) the affidavits supporting both warrants contained false statements and omissions; and (3) the search and seizure of his computer, electronic storage devices, and other items from his home exceeded the scope of the Nardinger Warrant. In his supplemental brief, Franz also argues that the Nardinger Warrant fails to satisfy the Fourth Amendment's particularity requirement.

With the exception of Franz's argument that the Nardinger Warrant lacks particularity, the

Court rejects all of Franz's arguments. However, the Court finds that the exclusionary rule does not apply to suppress any of the evidence collected pursuant to the Nardinger or Herrick Warrants.

### A.     The Nardinger Warrant Was Proper When Issued

A reviewing court must uphold a warrant provided that there is a "substantial basis" for the magistrate's finding of probable cause—that is, "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (internal quotation marks omitted). "In making this determination, the Court confines itself to the facts that were before the magistrate judge, i.e., the affidavit, and [does] not consider information from other portions of the record." *Id.* (internal quotation marks omitted). The "affidavit must be read in its entirety and in a common sense and nontechnical manner." *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993). Furthermore, "great deference" should be afforded to the magistrate's decision. *Hodge*, 246 F.3d at 305.

Franz objects to a number of individual paragraphs in the affidavit supporting the Nardinger Warrant ("Nardinger Affidavit"). He argues that certain paragraphs pertained solely to Jettmar's behavior, and he offers alternative interpretations of his statements and actions on the June 2009 trip. However, "statements in an affidavit may not be read in isolation—the affidavit must be read as a whole." *Conley*, 4 F.3d at 1208. As set forth in the Nardinger Affidavit, Agent Proctor heard Franz brag about taking mammoth tusks during previous trips through protected territory with Jettmar. (Nardinger Aff. ¶ 16.) Franz's statements were confirmed by a photograph on Jettmar's website and by Jettmar herself. (*Id.* ¶¶ 4, 9, 12.) Franz told Agent Proctor the tusks were located in his house and also mentioned he had another "special artifact" in his house. (*Id.* ¶¶ 10, 16.) Additionally, Franz and Jettmar made various comments suggesting that Franz knew they were engaged in illegal conduct.

(*Id.* ¶ 14.) Reading the affidavit in its entirety and in a non-technical manner, the Court concludes that the Magistrate had a substantial basis to find probable cause that Franz removed, or conspired with Jettmar to remove, paleontological resources from protected territory, and that evidence of those crimes was located in his home.

Franz also argues that the Nardinger Warrant was overbroad because there was "no legal basis to search his computer, zip drives, or any other external electronic storage device for any photographs." (Def.'s Mot. to Suppress at 6.) He claims that his camera broke on the first day of the trip and that the Nardinger Affidavit made "no mention of Franz being a trip historian on prior excursions." (*Id.*) In fact, the Nardinger Affidavit specifically stated that Franz told Agent Proctor "he had produced similar documentaries on other trips" and that he sought photographs from other participants during the June 2009 trip. (Nardinger Aff. ¶ 21.) These facts were sufficient to create probable cause for a search of Franz's computer and electronic storage devices for photographs, as the Nardinger Warrant expressly permitted. (*See* Nardinger Warrant Attach. B.)

### B.     Franz Has Not Made the Showing Necessary for a *Franks* Hearing

Franz has not explicitly requested a *Franks* hearing—an evidentiary hearing on the accuracy of information in warrant affidavits. *See Franks v. Delaware*, 438 U.S. 154, 167 (1978). However, because he argues that the affidavits supporting the Nardinger and Herrick Warrants contained certain false statements and cites to *Franks*, the Court will address whether a *Franks* hearing is required.

To overcome the general presumption that an affidavit supporting a search warrant is valid, "the defendant must make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to

5

the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Franks*, 438 U.S. at 171). In doing so, "the defendant cannot rest on mere conclusory allegations or a mere desire to cross-examine, but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Id.* at 383 n.8 (internal quotation marks omitted). Only after making such a showing is the defendant entitled to a hearing on the issue. *Franks*, 438 U.S. at 171-72.

Franz contends that references to collecting petrified wood in the Nardinger Affidavit were misleading because the Nardinger Affidavit neglected to mention that non-commercial collecting of petrified wood is legal. (*See* Nardinger Aff. ¶¶ 9, 17.) This argument misses the mark. The Nardinger Warrant did not authorize the seizure of petrified wood during the search. Rather, Franz's handling of petrified wood supported a finding that the mammoth tusks at issue would be located in Franz's Pennsylvania home, since it established a habit of collecting and shipping back items there from his trips.

Similarly, Franz contends that references to certain child erotica in the affidavit supporting the Herrick Warrant were misleading because the affidavit failed to advise the magistrate of controlling case law holding that these items are not contraband. But the affidavit never described these items as illegal. Moreover, child erotica is potentially admissible in child pornography cases.[1] *See United States v. Vosburgh*, 602 F.3d 512, 537-38 (3d Cir. 2010) (holding that district court did not abuse its discretion in admitting child erotica). Franz has not offered any proof of false statements or omissions in the affidavits supporting the Nardinger and Herrick Warrants. Therefore,

---

[1] The Government has filed a separate motion in limine seeking to admit the child erotica found in Franz's home to establish knowledge, intent, and absence of mistake or accident. The Court does not decide that motion at this juncture.

he is not entitled to a *Franks* hearing.

### C. Federal Agents Did Not Exceed the Scope of the Nardinger Warrant

Franz asserts that the search of his house and seizure of his belongings exceeded the scope of the Nardinger Warrant. In particular, he argues that: (1) the search of his computer went beyond what was necessary to find the evidence sought under the Nardinger Warrant; (2) the agents improperly seized his computer for off-site imaging rather than completing the imaging at his house; and (3) the agents improperly seized a metal lock box that was not covered by the Nardinger Warrant.

#### 1. Search of computer

Franz argues that the search of his computer exceeded the scope of the Nardinger Warrant. He maintains that there was no basis to search the "downloads" file on his computer because any files related to his trips with Jettmar were clearly labeled and placed in appropriate folders. However, "[s]uspects can easily hide information by mislabeling files, and, therefore, law enforcement officials are not required to accept a suspect's designation of what is contained in a particular file." *United States v. Highbarger*, 380 F. App'x 127, 130 (3d Cir. 2010). Accordingly, the search of Franz's computer under the Nardinger Warrant was not limited to the folders or files with obviously relevant labels.

Franz also contends that there was no reason to search files created before 2006 or after 2008 because the agents were seeking evidence regarding a trip that took place in 2007. This argument construes the scope of the Nardinger Warrant too narrowly. In addition to information about the 2007 trip, during which Franz took a mammoth tusk from protected lands, the scope of the Nardinger Warrant included evidence of a conspiratorial relationship between Franz and Jettmar going back

to 2002 and continuing past 2008. (*See* Nardinger Aff. ¶¶ 8, 16, 22.) Thus, files created before 2006 or after 2008 were covered by the Nardinger Warrant.

### 2. Seizure of computer

The Nardinger Affidavit stated that the agents would attempt to create an electronic image of the computer while at Franz's house. (Nardinger Aff. ¶ 32.) However, "if imaging prove[d] impractical, or even impossible for technical reasons," the agents would seize the computer and image it off-site. (*Id.* ¶ 33.) Franz argues that the agents made no effort to image his computer at his home, even though it would have been feasible to do so during the search. The Government responds that imaging Franz's computer and electronic storage devices would have taken over twelve hours and was clearly impractical to complete in Franz's home, as the eight-hour physical search ended after 2:00 a.m. The Court agrees that, under the circumstances, the agents were justified in seizing the computer and electronic storage devices for imaging off-site. *See United States v. Stabile*, 633 F.3d 219, 233 (3d Cir. 2011) (ruling that the seizure of hard drives was reasonable due to the "difficulty and risk" associated with on-site computer searches); *United States v. Hill*, 459 F.3d 966, 973-75 (9th Cir. 2006) (recognizing that seizure of computer and electronic storage devices is often necessary due to technological problems of on-site searching).

### 3. Seizure of metal lock box

Franz objects to the seizure of a fireproof metal lock box—which, when opened, was found to contain child pornography—as beyond the scope of the Nardinger Warrant. There is no question that the box was large enough to contain the evidence specified in the Nardinger Warrant, including slides, invoices, maps, and photographs in hard-copy and electronic form. Such evidence could have been found on thumb drives or other electronic storage devices nearly anywhere in the house.

Therefore, it was reasonable for the agents to search the metal lock box.

For the aforementioned reasons, Franz's claim that the agents exceeded the scope of the Nardinger Warrant during their search is without merit.

### D. The Nardinger Warrant, Though Facially Invalid, Does Not Implicate the Exclusionary Rule

Franz also argues that the Nardinger Warrant was facially invalid because Agent Nardinger served Franz with a copy of the warrant face sheet but not the accompanying attachments, which described the places to be searched and the items to be seized. Furthermore, Franz argues that the exclusionary rule applies to the evidence collected from Franz's home because Agent Nardinger intentionally and deliberately failed to serve the attachments on Franz. The Court disagrees.

#### 1. The warrant lacked particularity

"A government search of a private home presumptively violates the Fourth Amendment absent exigent circumstances or a valid warrant." *United States v. Wright*, App. A. No. 10-3552, 2012 WL 3519004, at *3 (3d Cir. Aug. 16, 2012). A warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When a warrant is accompanied by affidavits or attachments which describe the places to be searched or items to be seized, two requirements must be met for the warrant to satisfy the Fourth Amendment's particularity requirement: (1) the warrant must expressly incorporate the affidavits, and the incorporation must be clear; and (2) the affidavits must accompany the warrant; they cannot be impounded and sealed. *See Wright*, 2012 WL 3519004, at *3.

On July 30, 2009, Magistrate Judge Rueter issued the Nardinger Warrant and signed an order to seal and impound the Nardinger Warrant, the affidavit, and "any subsequent inventory, and

accompanying docket papers" in an effort to "maintain[] the secrecy of grand jury investigations, and ongoing criminal investigations." (*See* Def.'s Mot. to Suppress Ex. 1 [Nardinger Order to Seal].) On August 3, 2009, when the Nardinger Warrant was executed and served, Agent Nardinger did not provide Franz with the attachment describing the things to be searched for and seized, and the warrant face sheet given to Franz did not describe the things to be searched for and seized. (Gov't's Proposed Findings of Fact and Conclusions of Law at 4 ("The agent did not, however, serve a copy of the accompanying attachments, under the mistaken belief that because the affidavit was impounded, he could not leave a copy of the search warrant attachments.").)

Because the Nardinger Warrant and accompanying papers were filed under seal, and agents failed to provide Franz with a copy of Attachment B describing the things to be searched for and seized, the warrant is invalid due to lack of particularity. *See Bartholomew v. Pennsylvania*, 221 F.3d 425, 429-30 (3d Cir. 2000) ("[W]here the list of items to be seized does not appear on the face of the warrant, sealing that list, even though it is 'incorporated' in the warrant would violate the Fourth Amendment."); *Wright*, 2012 WL 3519004, at *3 (agreeing with the district court's decision that a warrant missing an attachment that described the items to be seized when served was facially invalid).

### 2. *The exclusionary rule does not apply*

Having decided that the Nardinger Warrant lacks particularity, the Court must now determine whether suppression is required. Even if a Fourth Amendment violation occurs, "[e]xclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search." *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)) (internal quotation marks omitted). Rather, "the rule's sole

purpose . . . is to deter future Fourth Amendment violations." *Id.* Where "the exclusionary rule does not result in appreciable deterrence" then exclusion is "unwarranted." *United States v. Janis*, 428 U.S. 433, 454 (1976). Furthermore, even if exclusion would deter future violations, "for exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 131 S. Ct. at 2427. This balancing test frequently turns on the nature of the police conduct. "When law enforcement officers exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong." *Wright*, 2012 WL 3519004, at *6 (quoting *Davis*, 131 S. Ct. at 2427) (internal quotation marks omitted). "On the other hand, when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way." *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 147-48 (2009)) (internal quotation marks omitted).

Because the agents did not act with deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, and this was an isolated incident, the Court finds that suppression here would not deter future Fourth Amendment violations. The warrant's lack of particularity was not due to gross negligence; it was due to an agent's reasonable misinterpretation of the circumstances. The Nardinger Warrant was prepared and executed by Agent Nardinger, an agent at the BLM. (Suppression Hr'g Tr. [Transcript] at 8.) At the suppression hearing, Agent Nardinger testified that the Nardinger Warrant was the first warrant that he had ever prepared or executed. (*Id*. at 48-49.) The decision about which Nardinger Warrant documents the government would seek to seal was made by the Pennsylvania and Alaska U.S. Attorneys, in conjunction with Agent Nardinger. (*Id.* at 48.) When executing the warrant, it was Agent Nardinger's reasonable misunderstanding of the intricacies of the Fourth Amendment that caused him to believe that he could not provide Franz with

a copy of the sealed attachment. (Execution of Nardinger Warrant Video [Video], Disk 1 at 1:30-2:00 ("You're not going to see the affidavit. The affidavit has been sealed . . . the affidavits and attachments thereto are sealed.").)

However, though he refused to give Franz the sealed supporting documents, Agent Nardinger explained the subject matter and circumstances that gave rise to the warrant, including the allegations that Franz removed a mammoth tusk from protected lands. At various points during the search, Agent Nardinger also verbally described to Franz the items that the warrant authorized him to take. (*See* Gov't's Proposed Findings of Fact and Conclusions of Law at 5-6; Video at 12:40-13:10 ("It's vertebrate paleontological remains that we're primarily interested in."); *id.* at 13:40 ("We're looking for any maps that you might retain from your trips."); *id.* at 15:13 ("Do you have any photographs? That's the other thing that we're going to be looking for.").) It is evident from Agent Nardinger's behavior that he had no intention of concealing the subject matter of the warrant or the information on Attachment B. This behavior weighs against applying the exclusionary rule. *See United States v. Tracey*, 597 F.3d 140, 145 (3d Cir. 2010) (considering the fact that "during the search, [the officers] explained the search warrant" to the defendant and his wife in its ultimate decision not to apply the exclusionary rule).

Likewise, Agent Nardinger's belief that he could not show Franz the attachments and affidavit because they were sealed was supported by the language in the sealing order. The order stated that "agents are authorized, as required by Fed. R. Crim. P. 41(d), to leave a copy of the search warrant and a receipt for the property seized with the person searched or at the property searched." (Nardinger Order to Seal.) Based on that language, an agent could reasonably have concluded that he was authorized to provide a copy of the search warrant face sheet but not the supporting

documents, such as the sealed affidavit and attachments. Similarly, the use of the words "are authorized" in the sealing order could have led a reasonable agent to conclude that he was permitted, but not required, to supply Franz with Attachment B.

Lastly, Franz has presented the Court with no evidence that Agent Nardinger's refusal to provide Franz with the warrant attachment was "recurring or systemic," thereby also supporting the view that suppression would not deter future violations. *See Tracey*, 597 F.3d at 154. Because suppression in these circumstances would have little to no deterrent effect, and the societal costs of excluding relevant, reliable evidence in a criminal prosecution involving child pornography are substantial, the exclusionary rule does not apply to the evidence obtained pursuant to the Nardinger Warrant.

### E. Effect on the Herrick Warrant[2]

Franz argues that, because the Nardinger Warrant was improper, all evidence seized from the Herrick Warrant must be suppressed as "fruits of the poisonous tree." The Court disagrees for two reasons. First, because of the high societal costs of exclusion and low probability of deterrence, the Court finds that the exclusionary rule does not apply. In the alternative, even if the exclusionary rule did apply, under the good faith exception the suppression of evidence collected pursuant to the Herrick Warrant would not be justified.

#### 1. *The exclusionary rule does not apply*

Contrary to Franz's assumption that the exclusionary rule automatically requires suppression

---

[2] In an abundance of caution, the Court analyzes the Herrick Warrant separately for application of the exclusionary rule and its exceptions. However, in *United States v. Kepner*, the Third Circuit held that when evidence seized pursuant to a subsequently invalidated warrant was deemed by the court to be admissible (in that case, because of the good faith exception), evidence "derived from that evidence is necessarily admissible as well." 843 F.2d 755, 764 (3d Cir. 1988).

of the Herrick Warrant evidence, "whether the exclusionary sanction is appropriate[] . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *United States v. Leon*, 468 U.S. 897, 906 (1984); *see United States v. Dupree*, 617 F.3d 724, 731 (3d Cir. 2010) (explaining that after a court determines a search or seizure is unreasonable, it must then separately assess whether the "circumstances warrant suppression").

For reasons similar to those discussed above, the Court finds that the exclusionary rule does not apply to the Herrick Warrant. First, the costs to society of excluding the relevant evidence in a criminal prosecution are high, as discussed above. *See Herring*, 555 U.S. at 142 ("The principal cost of applying the [exclusionary] rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system"); *Hudson v. Michigan*, 547 U.S. 586, 595 (2006) (acknowledging that there are "grave adverse consequence[s]" that come from "exclusion of relevant incriminating evidence "); *Tracey*, 597 F.3d at 151 (discussing the "high social costs of excluding evidence in a criminal case").

Second, the Court discerns no deterrent effect that would come from suppressing the evidence because the agents did not act recklessly. When executing the Herrick Warrant, the agents would have been unaware that it was issued based on information obtained pursuant to a prior warrant that lacked particularity. Likewise, the agents cautiously sought guidance at every step of the search. Upon uncovering what the agents believed to be child pornography, the agents called the U.S. Attorney's Office for advice on how to proceed. Later, during the initial search of the computer, the agents sought guidance from the FBI on how to proceed. Then in an abundance of caution, the agents obtained a separate warrant to examine the electronic media and computer collected under

14

the Nardinger Warrant. *See Stabile*, 633 F.3d at 246 ("[T]he very fact that the Government attempted to secure state and federal search warrants at every step of the search indicates that there would be little deterrence benefit in punishing the Government.").

In addition, at the time of execution the Herrick Warrant would have appeared to be supported by adequate probable cause. The affidavit supporting the Herrick Warrant described materials found in Franz's home, chiefly two magazines, one deck of playing cards, and one book, as containing sexually explicit or lascivious images of minors. (Herrick Aff. ¶ 16.) Based on that child pornography, as well as the image of a partially nude minor female and file names indicative of child pornography on Franz's computer, there was a substantial basis for an agent executing a warrant to believe that there was probable cause that evidence of possession or receipt of child pornography would be found on Franz's computer and electronic storage media. Because the Court finds that the costs to society greatly outweigh the non-existent deterrent effect of suppressing the Herrick evidence, the Court declines to impose "the extreme sanction of exclusion." *Herring*, 555 U.S. at 140.

        2.     *The good faith exception applies*

Even if the exclusionary rule applies, the Court finds that the good faith exception allows the admission of the evidence obtained under the Herrick Warrant. Evidence is admissible under the good faith exception to the exclusionary rule "if an officer obtains a warrant and executes it in good faith." *United States v. Stearn*, 597 F.3d 540, 561 (3d Cir. 2010) (quoting *Leon*, 468 U.S. at 921). That is because "the marginal or nonexistent benefits produced by suppressing evidence obtained in reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Leon*, 468 U.S. at 922. As in this case, the "mere existence of a warrant . . .

suffices to prove that an officer conducted a search in good faith, and will obviate the need for any deep inquiry into reasonableness." *Stearn*, 597 F.3d at 561 (quoting *Hodge*, 246 F.3d at 308) (internal quotation marks omitted).

As discussed above, the record is clear that the agents executing the Herrick Warrant acted in good faith reliance on the validity of that warrant. On its face, the Herrick Warrant, which was approved by an impartial magistrate judge, appeared valid. It contained attachments with descriptions of the places to be searched and items to be seized. It included an affidavit that supported a finding of probable cause. And it was not overbroad. Because it was objectively reasonable for the agents to rely on the Herrick Warrant, the good faith exception applies to admit the evidence. *See United States v. Raisley*, 466 F. App'x 125, 129 (3d Cir. 2012); *Stearn*, 597 F.3d at 561.

## IV. CONCLUSION

The Court finds that, although the Nardinger Warrant lacked particularity when it was executed, the circumstances do not warrant application of the exclusionary rule. Therefore, Franz's motion to suppress is denied. An Order consistent with this Memorandum will be docketed separately.